667 F.2d 600
 CHARTER HOUSE INSURANCE BROKERS, LTD., Plaintiff and
Counter-Defendant-Appellant,
v.
NEW HAMPSHIRE INSURANCE COMPANY, Defendant and
Counter-Plaintiff-Third Party Appellee,
v.
UNITED STATES of America, Third Party Defendant-Appellee.
 No. 80-2494.
 United States Court of Appeals,
Seventh Circuit.
 Argued Oct. 30, 1981.
Decided Dec. 10, 1981.*
Opinion Dec. 28, 1981.
 
 John F. O'Meara, Arlington Heights, Ill., for plaintiff and counter-defendant-appellant.
 Russell L. Caplan, Dept. of Justice, Washington, D.C., for third party defendant-appellee.
 Before CUMMINGS, Chief Judge, SPRECHER, Circuit Judge, and CAMPBELL, Senior District Judge.**
 CUMMINGS, Chief Judge.
 Charter House Insurance Brokers, Ltd. ("Charter House") appeals from the dismissal of its suit against New Hampshire Insurance Company ("NHIC"). The district court ordered the dismissal as a sanction for Charter House's refusal to comply with proper discovery requests. Finding no abuse of discretion by the district judge, we affirm.
 * Charter House sued NHIC for damages arising out of a 1978 government undercover operation that went awry. NHIC and its parent company, American International Group, Inc., had lent their cooperation to an FBI investigation of organized crime's activities in government-financed construction projects. Exactly how the operation went wrong is neither clear nor relevant to this appeal. Charter House claimed to have been caught in the fallout. It said it had been induced by Norman Reed, a middle-man acting for NHIC,[1] to broker construction surety bonds that were not valid. Charter House therefore sued NHIC in late 1978, alleging that: (1) NHIC was liable for premium losses of $237,244 because it clothed Reed with actual or apparent authority (Count I); (2) NHIC's agents'[2] deceit had caused Charter House to suffer $10.5 million of direct and consequential losses (Count II); (3) NHIC's letters disavowing the bonds defamed Charter House and caused it $10.5 million in losses (Count III); (4) NHIC's letters amounted to intentional interference with the business relationships of Charter House and its clients, for which a total of $40.5 million in compensatory and punitive damages was sought (Count IV); and (5) NHIC was liable for the $237,244 in premium losses because of its negligence in giving Reed its power of attorney.
 NHIC's answer denied all responsibility for Reed's criminal activities and alleged that Charter House's own illegal brokerage practices prevented it from claiming damages from NHIC. NHIC also counterclaimed for $35 million in compensatory and punitive damages for Charter House's "malicious, wanton, reckless, and fraudulent" conduct in selling the bonds. At the urging of NHIC, the government was made a third party defendant in the suit and undertook to handle NHIC's defense and counterclaim and to indemnify NHIC against any liability. Thus after June of 1979, the litigation was mainly in the hands of Fred Louis and David Austern, Charter House's counsel, and Mark Kurzmann, a Justice Department attorney representing the government and NHIC.
 
 
 1
 The course of events after the filing of the complaint was far from smooth. In January 1979 Charter House made a Request for Production of NHIC Documents under Rule 34 of the Federal Rules of Civil Procedure. NHIC filed its objections within the thirty-day time period prescribed by the Rule. Govt.Br. 28a. Charter House also served interrogatories on NHIC, to which NHIC made timely objection under Rule 33. Govt.Br. 75a.[3] In November 1979 Charter House deposed NHIC's general counsel, and shortly thereafter NHIC complied with the original document production request. Charter House Br. 4; Govt. Br. 5-6.[4]
 
 
 2
 NHIC filed two Requests for Production on Charter House, one on April 23, 1979, and another on October 10, 1979. Neither was complied with or objected to within the time limits of Rule 34. On February 12, 1980, NHIC presented to Judge Aspen a motion "For Sanction of Dismissal of Plaintiff's Claims * * * or * * * to Compel Production of Documents." At the time of the motion, Charter House had produced nothing, nor had it applied for a protective order. At the hearing, however, Charter House's counsel Fred Louis promised to turn over the documents requested within a ten-day period, if the court would postpone ruling on the motion until February 22. Mr. Louis clearly understood the seriousness of his undertaking: "The Judge stated that if discovery has not been completed by that time, he would grant the motion."[5]
 
 
 3
 Some six hundred pages of material were mailed to Washington on February 18. As of the February 22 hearing, Mr. Kurzmann had not inspected them. He had been told by Mr. Millbranth, the Charter House attorney in charge of collecting and mailing the documents, that the material "substantially complied" with the requests for production, but lacked the financial statements of Mr. Foundos, an owner of Charter House, and the items requested about Royal Exchange, a premium finance company related to Charter House.[6]
 
 
 4
 On February 22 Judge Aspen granted NHIC's motion to dismiss Charter House's suit. Under Rule 41(b) of the Federal Rules of Civil Procedure, this became a dismissal with prejudice. Charter House attorneys, having mistaken the time of the hearing, were not present.[7] On February 29 they presented a Motion to Vacate the Order of Dismissal. Judge Aspen had the case
 
 
 5
 referred to a magistrate, to supervise production of all documents by the plaintiff to the government to be done in 45 days; and to regulate discovery and submission of a pretrial order. Motion to vacate dismissal will be allowed in 45 days if magistrate certifies to Court that all documents have been turned over.
 
 
 6
 Order, February 29, 1980.
 
 
 7
 At that juncture the parties betook themselves to Magistrate Cooley, where problems of intransigence continued. After considerable jockeying by both sides, Mr. Louis provided identical affidavits of Mr. Foundos and Mr. Patterson, the owners of Charter House, in which they swore (Govt.Br. 101a, 102a):
 
 
 8
 (t)hat all of the documents, records and written material in the possession of Charter House Insurance Brokers, Ltd. and affiant has been produced and turned over to the Attorney for the U.S. Department of Justice;
 
 
 9
 (t)hat affiant has no knowledge of any other documents that were either created or subsequently destroyed that relate to any of the issues in the Complaint or Counterclaim in this cause;
 
 
 10
 (t)hat the only other documents known by affiant that relate to the issues in this cause were turned over pursuant to a subpoena issued by a Grand Jury or someone acting in its behalf in connection with the criminal prosecution of Norman Howard Reed, the person who committed the acts alleged in the Plaintiff's Complaint regarding the sale of certain forged surety bonds;
 
 
 11
 (t)hat affiant knows of nothing that can be produced either directly or indirectly by Charter House Insurance Brokers, Ltd., or affiant that would comply with the Notices to Produce served herein by the attorneys for New Hampshire Insurance Company and the United States of America.
 
 
 12
 Later Mr. Foundos and Mr. Patterson were deposed. Only then did it become clear that many documents had not been produced. The deponents sought to justify nonproduction on the following grounds: (1) some documents related to Charter House's non-bond business; (2) some material had been produced and lost by the defendant; (3) the government itself could gain access to the grand jury materials; and (4) the documents relating to sister enterprises of Charter House were not relevant to this litigation.[8] Charter House had raised none of these objections in a timely fashion. Instead it relied on its unilateral ability to construe and interpret the requests for production.
 
 
 13
 On August 26, 1980 Magistrate Cooley refused to certify that discovery had been completed. His report to Judge Aspen was unequivocal in recommending dismissal:
 
 
 14
 Simply stated, this record reveals unquestionably that plaintiff has failed miserably in its attempt to persuade this court that "all documents have been turned over." On the contrary, this record reflects, clearly and convincingly, that plaintiff has deliberately withheld documents which are unarguably discovery-relevant to this action in which plaintiff has asserted a claim for damages in excess of $40,000,000.00. Such resistance to discovery in itself is, in this Circuit, clearly punishable by the sanction of dismissal, see Margoles v. Johns, 587 F.2d 885 (7th Cir. 1978), and is equally repugnant and intolerable, if not more so, where, as here, a district court graciously affords an obstinate litigant a second chance to make full disclosure.
 
 
 15
 Magistrate's Report 9-10; Govt.Br. 111a-113a (footnotes omitted).
 
 
 16
 On September 17, 1980, Judge Aspen adopted the magistrate's finding and conclusions, having considered and rejected invoking lesser sanctions. Since "Plaintiffs * * * have failed to satisfy the one dispositive condition of the February 29, 1980 Order * * *, notwithstanding generous opportunities given to it by this Court to cure its discovery defaults," Judge Aspen allowed his dismissal order to stand. He also dismissed NHIC's counterclaim without prejudice, with defendants' acquiescence.
 
 II
 
 17
 In its effort to have Judge Aspen's dismissal order reversed. Charter House has mustered a wealth of constitutional, procedural, factual, and policy arguments. It has however not appreciated the basic legal issue in the case and accordingly many of its arguments are misdirected.[9]
 
 
 18
 A. The Applicable Provisions of the Federal Rules of Civil Procedure.
 
 
 19
 The Federal Rules of Civil Procedure have two distinct provisions for discovery sanctions. If discovery responses are made but are inadequate, the party seeking discovery must apply to the court for an order to compel discovery (Rule 37(a)); and sanctions cannot be invoked until the court order is disobeyed (Rule 37(b)). But if a "party or an officer, director, or managing agent of a party, or a person designated under Rule 30(b)(6) or 31(a) to testify on behalf of a party" does not appear for a properly noticed deposition, does not answer or object to interrogatories properly served, or does not make a written response to a proper Rule 34 request for production or inspection, the court may impose sanctions directly, without first issuing an order to compel discovery (Rule 37(d)). 4A Moore's Federal Practice P 37.05 (1981) explains the rationale for the distinction:
 
 
 20
 In such a system, designed to operate insofar as possible without judicial intervention, it is crucial of course, that the initial request be answered and such objections as the party may have be set forth. If it were necessary to seek a court order requiring a response, followed by a response setting up objections, followed by a second motion to resolve the objections and order discovery, the possibility of delay and abuse would be apparent. Rule 37(d) makes it explicit that a party properly served has an absolute duty to respond * * *. Thus there must be an order under subdivision (a) before sanctions are imposed under (b), while under (d) the party aggrieved moves directly for the imposition of sanctions.
 
 
 21
 At the time of the government's motion on February 12, 1980, Charter House was in the position described in Rule 37(d), having taken no action whatsoever on either of the defendants' requests for production. Judge Aspen would have been justified therefore in imposing sanctions immediately, calibrating the severity of the sanctions with the willfulness of Charter House's recalcitrance. See II C infra.
 
 
 22
 However, Judge Aspen was forestalled by Mr. Louis' promise to produce the missing material within ten days. Charter House takes the position that its late and incomplete tender should have ended the applicability of Rule 37(d) and set in motion instead the procedures of Rule 37(a) and 37(b). Br. 8-17. It then argues that those procedures could not properly lead to a dismissal, because Judge Aspen entered no order under Rule 37(a) as a predicate for dismissing the complaint under Rule 37(b). Br. 20-22. Charter House's position has two weaknesses. First, it overestimates the curative effects of dilatory and partial compliance. See, e.g., Margoles v. Johns, 587 F.2d 885 (7th Cir. 1978) (documents produced after defendant filed motion to dismiss did not cure disobedience of court order; dismissal granted); G-K Properties v. Redevelopment Agency, 577 F.2d 645 (9th Cir. 1978) (documents tendered at hearing on motion to dismiss rejected by court; prior violation of order to produce justified dismissal). Second, Charter House's theory ignores the effect of the colloquy between Mr. Louis and Judge Aspen. If a court order were necessary, then Mr. Louis' promise in open court, which was not kept, could be treated as the equivalent of an order. See, e.g., Jones v. Uris Sales Corp., 373 F.2d 644 (2d Cir. 1967) (proceedings in judge's chambers on Oct. 21 treated as oral motion and order to produce; proceedings on Oct. 22 treated as oral motion for sanctions and order for default judgment). Accord, Henry v. Sneiders, 490 F.2d 315, 318 (9th Cir. 1974), certiorari denied, 419 U.S. 832, 95 S.Ct. 55, 42 L.Ed.2d 57 ("Where oral proceedings unequivocally give a litigant notice that certain documents are to be produced, the absence of a written order does not preclude the entry of a default judgment for failure to comply."). On either hypothesis, therefore, Charter House still had not met its discovery obligations by the time the hearing on the motion for sanctions reconvened on February 22.
 
 
 23
 B. Procedural Due Process Issues.
 
 
 24
 At the February 22 hearing, attorneys for Charter House did not appear, and Judge Aspen entered an unconditional order of dismissal. A week later he modified his order, giving Charter House 45 additional days to comply with the two requests for production and assigning the case to Magistrate Cooley to supervise. Charter House has argued that this procedure was unfair. Br. 27-36. Magistrate Cooley, it says, assumed that Judge Aspen had found willfulness in Charter House's conduct and refused to hear evidence on that point. But Judge Aspen ultimately treated the magistrate's findings on willfulness as dispositive. Charter House maintains that it was deprived of the opportunity for a full and fair hearing by the Alphonse-and-Gaston aspects of the procedure.
 
 
 25
 We cannot agree. In the proceedings before Judge Aspen on February 29, Charter House submitted a motion that covered its central factual contentions and a memorandum of law in support of its motion. It renewed its arguments in the June 23 hearing before the magistrate on its motion to have full production certified. Over the government's objections, it was given ample time to respond in writing to the magistrate's findings before the district court made its final ruling. We find no indication that the division of responsibilities between the trial judge and the magistrate compromised Charter House's ability to argue its position. Under these circumstances, the failure to hold yet another hearing, at which the evidence would have been cumulative, did not prejudice Charter House. Cf. Margoles v. Johns, supra, 587 F.2d at 889 (briefs and affidavits adequately illuminated circumstances of noncompliance; additional oral argument or testimony unnecessary); Cine Forty-Second Street Theatre Corp. v. Allied Artists Pictures Corp., 602 F.2d 1062, 1066 n.7 (2d Cir. 1979) (plaintiffs demanded evidentiary hearing on reargument of motion to dismiss; district court decided "that in light of the extensive proceedings already conducted before the magistrate, an evidentiary hearing in the district court could serve no useful function.").
 
 
 26
 C. The Choice of Sanction.
 
 
 27
 It is well settled that a district judge should tailor the choice of sanction to the severity of the misconduct. A Rule 37 dismissal requires a showing of "willfulness, bad faith, or fault" by the dismissed party, under the standards of Societe Internationale v. Rogers, 357 U.S. 197, 212, 78 S.Ct. 1087, 1096, 2 L.Ed.2d 1255 and National Hockey League v. Metropolitan Hockey Club, Inc., 427 U.S. 639, 640, 96 S.Ct. 2778, 2779-80, 49 L.Ed.2d 747 (per curiam). Without such a showing there are constitutional obstacles to depriving a litigant of his day in court. It is equally well settled that the decision to impose appropriate sanctions is the responsibility of the trial judge and is reviewable only for abuse of discretion. National Hockey League, supra, 427 U.S. at 642, 96 S.Ct. at 2780. The trial judge must have considerable latitude to make the sanctions serve their function as both specific and general deterrents. Id. at 643, 96 S.Ct. at 2781.
 
 
 28
 Charter House first insists that its conduct was not willful, because it believed in good faith that the requests to produce did not cover a great many of the documents in this case. But Charter House was not entitled to rely on its interpretation. It should have sought the court's interpretation, either by objecting to the requests in timely fashion or by applying for a protective order under Rule 26(c). Its failure to take either step obstructed both the district judge and the magistrate in the performance of their duties. Cf. Mertens v. Hummell, 587 F.2d 862, 864 n.2 (7th Cir. 1978) (per curiam, adopting the opinion of Judge Decker). Charter House cannot be heard to justify its conduct on the basis of self-inflicted misunderstanding.
 
 
 29
 Charter House also argues that no matter how egregious its conduct was, Judge Aspen never made the findings necessary to support a dismissal order. This argument is the due process argument of II B supra in a slightly different guise. It assumes that the case was dismissed at the time it was referred to the magistrate, subject to reinstatement if the magistrate certified total production. As a corollary, it assumes that Judge Aspen's finding of willfulness had to precede, and could not rely on, the findings of Magistrate Cooley.[10] A less sophistic interpretation of these events leads us to believe that Judge Aspen had no duty to make findings as of February 22 because he was giving Charter House one more chance, under a deadline, to comply with the requests to produce. At the end of that time, Charter House still was delinquent; according to the magistrate it had "failed miserably in its attempt to persuade this court that 'all documents have been turned over.' " Magistrate's Report 9; Govt.Br. 112a. The magistrate's report, which Judge Aspen incorporated in his memorandum order, set out in detail (1) the discrepancies between the sworn affidavits of Charter House's owners and the actual sketchy production; (2) the specific and clear requests not complied with; and (3) the importance of the material sought to the litigation. It discounted as incredible Charter House's assertions that some documents had been produced but later lost by the government, and that still others had not been returned to Charter House by the grand jury. Charter House fastens on the magistrate's statement that its conduct was the more "repugnant and intolerable * * * where, as here, a district court graciously affords an obstinate litigant a second chance to make full disclosure," as evidence that Magistrate Cooley's conclusions were not based on his own experience but on what he assumed Judge Aspen's experience to have been. But the report read in its entirety is clearly not based on guesswork or inference, but on direct knowledge of Charter House's conduct. The facts known to the magistrate are more than adequate to show willfulness, and Judge Aspen was therefore justified in adopting the magistrate's findings and dismissing Charter House's complaint.[11]
 
 
 30
 For the reasons stated, we hold that the district court did not abuse its discretion in its choice of sanction. The decision below is affirmed; costs to appellees.
 
 
 
 *
 This appeal originally was decided by unreported order on December 10, 1981. See Circuit Rule 35. The panel has decided to issue the decision as an opinion
 
 
 **
 The Honorable William J. Campbell, Senior District Judge for the Northern District of Illinois, is sitting by designation
 
 
 [1]
 According to David Austern, one of the attorneys for Charter House, Norman Reed had been indicted and had pled guilty to insurance fraud by May of 1980. He was also the defendant in four pending federal criminal cases and two state cases. Transcript of proceedings, May 29, 1980, at 8-9
 
 
 [2]
 I.e., Norman Reed and the Northfield Organization, which was Reed's base of operations under an agency agreement with NHIC
 
 
 [3]
 Charter House could have responded with a motion to compel answers but it apparently never did so. Transcript of proceedings, May 29, 1980, at 43-45
 
 
 [4]
 The one document not produced was a cancelled check that could not easily be retrieved. Other documents produced did reveal the amount of the check and the identity of the payee. Charter House's argument (Br. 39-41) that NHIC's record of compliance was no better than its own is without merit
 
 
 [5]
 Letter from Fred Louis to Russell Millbranth, another of Charter House's attorneys, dated February 12, 1980, and attached as an exhibit to Charter House's Motion to Vacate Order of Dismissal
 
 
 [6]
 Transcript of telephone conversation between Fred Louis and Russell Millbranth, dated February 22, 1980, and attached as an exhibit to Charter House's Motion to Vacate Order of Dismissal
 
 
 [7]
 Charter House later suggested to the magistrate that Judge Aspen had granted the government's motion because of the absence of Charter House's attorneys. "It was like a default." Transcript of proceedings, April 3, 1980, at 18. Even though neither the magistrate nor the district judge based the determination of willfulness on counsel's nonappearance, Charter House now urges that it was tacitly considered. Br. 31-32. There is no support in the record for this assertion
 
 
 [8]
 Summarized at Magistrate's Report 6-9; Govt.Br. 109a-112a
 
 
 [9]
 For example, its assumption that dismissal or default judgment is possible, in the absence of a court order, only if the wrongdoer has lulled or deceived its opponent into not applying for a court order, is wrong. So is its assertion that in the absence of any objections by Charter House, the burden of showing that Charter House possessed the documents sought rests on NHIC or the government. Its "unclean hands" argument, note 4 supra, is not supported by the facts, and its belief that findings of willfulness must follow certain formal rules (Br. 42-43) is not the view in this Circuit. Finally, its arguments that dismissal is a disfavored and in this case a constitutionally invalid sanction depend on the assertion that Charter House had complied fully in the discovery phase of this litigation. That assertion is patently untrue
 
 
 [10]
 This is not the position Charter House's counsel had taken before the magistrate. Asked if Judge Aspen had dismissed the case, Mr. Louis replied, "No, sir. He reinstated my case pending the certification * * *." Transcript of proceedings, April 3, 1980, at 40. Later Mr. Louis admitted that the language of the minute order technically did not support his position, and told the magistrate, "That's why I'm not objecting to the way you are proceeding." Id. at 42. It is difficult to square this acquiescence with Charter House's later insistence that the procedure was unfair
 
 
 [11]
 It is worth noting that less drastic sanctions, which Judge Aspen said he had considered, would not have served any purpose. The government's costs for the February 22 and 29 hearings had already been assessed against Charter House on February 29 and produced no change in its behavior. Postponing the trial date, when Charter House was already engaged in dilatory tactics, would have been ineffective. Allowing Charter House to produce evidence only in areas not subject to the discovery disputes would have been tantamount to dismissal, since Charter House would then have been barred from proving its theories of causation and damage