**AM INTERNATIONAL, INC., Plaintiff,**

v.

**EASTMAN KODAK CO., Defendant.**

**No. 80 C 4016.**

United States District Court,
N.D. Illinois, E.D.

Aug. 1, 1983.

---

See also, D.C., 100 F.R.D. 255.

L. Michael Jarvis, Mark T. Banner, D. Dennis Allegretti, Charles G. Call, Allegretti, Newitt, Witcoff & McAndrews, Chicago, Ill., Anthony W. Karambelas, Los Angeles, Cal., for plaintiff.

Charles A. Bane, Donald C. Clark, Jr., Paul W. Schroeder, Isham, Lincoln & Beale, Chicago, Ill., Stanley C. Macel, III, Arthur G. Connolly, Connolly, Bove & Lodge, Harold Pezzner, Connolly, Bove & Lodge, Wilmington, Del., for defendant.

## MEMORANDUM OPINION AND ORDER

DECKER, District Judge.

Plaintiff, AM International, Inc. ("AMI"), brought this action against Eastman Kodak Company ("Kodak"), alleging that the Ektraprint Copier-Duplicator machines manufactured, used and sold by Kodak infringe four U.S. Patents owned by AMI. These four patents are No. 3,838,921 ("Sargis"); No. 3,598,580 ("Baltazzi"); No. 3,606,532 ("Shelffo"); and No. 3,476,382 ("Tregay").[1] In its answer to the complaint, Kodak denied all material allegations and raised various affirmative defenses, including questions of the patents' invalidity and unenforceability based on laches, estoppel, unclean hands and the purported intentional failure of AMI to inform the United States Patent and Trademark Office ("the Patent Office") of relevant prior art. In addition,

Kodak filed a counterclaim against AMI for unfair competition. The unclean hands defense and the counterclaim are based on allegations that the instant suit is groundless and was brought in bad faith to achieve objective unrelated to the patents in issue. Currently pending is Kodak's motion for summary judgment, in which it seeks dismissal of the complaint both on the merits and as a sanction for AMI's purported refusal to comply with Fed.R. Civ.P. 37 orders of this court.

## I. *The Complaint.*

According to the complaint, filed on July 30, 1980, AMI has for several years devoted substantial time and effort to the development of photoelectrostatic copying and duplicating machines. AMI contends that this effort culminated in the development of prototype photocopying apparatus incorporating such features as xenon flash exposure; a continuous, transparent, organic photoreceptor belt; a multiple-roll magnetic brush developer; and a recirculating document handler operating at a machine speed of approximately 70 copies per minute. Approximately 150 United States patents including the patents at issue in the case at bar, were issued to plaintiff's employee/inventors and assigned to plaintiff as a result of this research and development. *See* Complaint, ¶ 5.

AMI states that in 1976, Kodak introduced the Ektaprint Copier-Duplicator which allegedly "is, in many respects, the full equivalent of the production prototype machines plaintiff had developed after more than a decade of research and development." Complaint, ¶ 7. AMI charges that Kodak's manufacture, use and sale of the Ektaprint copiers represent a continuing violation of its patent rights.

## II. *The Patents at Issue.*

### A. *The Sargis Patent.*

The Sargis patent was issued by the Patent Office on October 1, 1974, and is enti-

---

**1.** At the same time it filed the instant action, AMI also filed suits charging the same Kodak machines with infringement of the same patents in the United States Court of Claims, and on

Canadian counterparts of three of them in the Canadian courts. The Canadian counterpart of Sargis was not included in the Canadian suit.

tled "Photoelectrostatic Copying Apparatus." It relates to a copying apparatus employing a photoconductive member from which developed images are transferred to produce copies. The patent purports to provide new and improved means for freeing-up toner powder remaining on the photoconductive member after transfer of a developed image to a copy sheet. On November 17, 1980, Kodak was advised by AMI that the latter had elected to disclaim the Sargis patent, and approximately one year later, AMI filed a formal disclaimer of the patent.[2]

According to Kodak, the Sargis patent was specifically described in a prior art Japanese publication ("the Fuji publication"). Kodak contends that while the Sargis application was pending before the Patent Office, AMI was aware of the allegedly invalidating Fuji publication and deliberately concealed such information from the Patent Office. In support of this claim, Kodak asserts that during the pendency of the application, AMI filed several foreign counterparts, all of which were rejected as unpatentable because of the Fuji publication before the United States Patent Examiner forwarded his initial action on Sargis on June 6, 1973.[3] Kodak also relies on AMI's interrogatory answer that "the only prior art considered in connection with the decision to withdraw the Sargis patent from the present action and to disclaim it was the Japanese Patent Publication No. 12,993 [Fuji], ..." AMI Supplemental Interrogatory Answer No. 10(a), at 3.

AMI strenuously objects to Kodak's characterization of both its actions before the Patent Office and the relationship between the Sargis patent and the Fuji publication. AMI argues that the Fuji publication is not an invalidating reference to the Sargis patent; it insists that it has never been advised that the Fuji publication

would render the Sargis patent invalid. In support of these assertions, AMI relies on deposition testimony of Sol Goldstein ("Goldstein"), former general patent counsel for AMI, to the effect that he was not aware of any study concluding that the Sargis patent was weak nor of any document suggesting that the patent was invalid. AMI also relies on the deposition testimony of Anthony W. Karambelas ("Karambelas"), Goldstein's successor as general patent counsel for AMI:

Q: Did you form any opinion as to whether or not the Sargis patent would likely be held invalid over Fuji if it were retained in the litigation?

. . . . .

A: ... My opinion was it would not be held invalid.

(Karambelas deposition, at 60–61).

AMI asserts that the Sargis patent was withdrawn from the instant suit and disclaimed "in an attempt to simplify the litigation." Memorandum in Opposition to Kodak's Motion for Summary Judgment ("AMI Memorandum"), at 13. It relies here on the deposition testimony of Charles G. Call ("Call"), AMI's trial counsel:

Q: It [Fuji] was a strong enough reference for you to look at it and on the same day tell us that AM[I] had elected to disclaim the patent and did not care to pursue it in the lawsuit any more, is that true?

A: No. That is overemphasizing the importance of the reference and minimizing the importance of the situation. I looked at the reference and I thought it was a pertinent reference. Then I looked at the situation which involved the abandonments in the foreign countries and I foresaw, ... the fact that the reference had not been cited to the U.S. Examiner

---

2. While it has been formally disclaimed, the Sargis patent remains an issue in this action because of Kodak's unclean hands defense and its unfair competition counterclaim. *See Standard Packaging Corp. v. Curwood, Inc.*, 182 USPQ 399 (N.D.Ill.1974).

3. Kodak notes that Sargis foreign counterparts were rejected by the German Patent Office on July 26, 1972, and by the Japanese Patent Office on February 13, 1973. It also states that Sargis' Dutch counterpart was abandoned after the Fuji publication was cited by the United States Examiner on July 18, 1972.

whether it was pertinent or not [was] going to vastly complicate this lawsuit and form the basis for fraud allegations. It was not a decision based really on the merits of the reference at all. It was based on the overall situation and how I know that fraud allegations terribly compound a patent litigation. That is why I recommended that we get it out of there.

(Call deposition, at 170–171).

### B. *The Baltazzi Patent.*

The Baltazzi patent was issued on August 10, 1971, and is entitled "Photoelectrostatic Copying Process Employing Organic Conductor." This patent relates to the transfer of toner images to copy sheets by applying specific transfer pressures.

Kodak alleges that before filing this action, AMI knew that the Baltazzi patent was invalid and not infringed. Kodak relies on a memorandum authored by Goldstein and dated September 2, 1976, in which it alleges that Goldstein advised AMI long before this suit was initiated that the Baltazzi patent would not be infringed by a photocopy machine using a corona electrode, rather than a roller electrode, to achieve transfer. It further claims that AMI was aware that the Baltazzi patent described only the use of a roller electrode for transfer and specified that such an electrode must operate at a transfer pressure of 2 to 100 pounds. Kodak charges that AMI, with full knowledge that the Ektaprint machines use a corona electrode for transfer, nevertheless included the Baltazzi patent in this action, and that AMI never conducted any tests to determine the transfer pressure of the corona electrode.

As to the claim of invalidity, Kodak relies on a memorandum authored by Russell Root ("Root"), a patent attorney, and dated February 22, 1978, in which it alleges that Root advised AMI that relevant prior art had not been cited by the Patent Office.

AMI challenges these claims on several grounds. First, AMI correctly notes that the Goldstein memorandum referred to an IBM machine: "[o]ur assessment of IBM relative to this patent [Baltazzi] was that there is no infringement." (Emphasis supplied.) This interpretation is supported by Goldstein's deposition testimony that his memorandum referred to a "particular IBM construction" (Goldstein deposition, at 97). Second, AMI relies on Goldstein's deposition testimony that "[t]here are circumstances where a corona could conceivably be, from a technical standpoint, the equivalent of a roller," (Id. at 99), that the type of transfer used in the Baltazzi patent "might not" differ from the corona transfer used in the Ektaprint machine, (*Id.* at 291), and that it is possible to infer that if transfer is obtained, the pressure created—whether by roller or corona—would be adequate. (*Id.* at 297.) Third, AMI relies on Karambelas' deposition testimony that he personally reviewed the Baltazzi patent and was "fully satisfied" that the patent was valid and infringed. (Karambelas deposition, p. 115.) Fourth, AMI refers to a memorandum written by Call and dated April 10, 1980, in which Call reviewed the patents at issue in this action and concluded, in part, that the Baltazzi patent "can and should be asserted against the EKTAPRINT machines." Fifth, AMI relies on Call's deposition testimony:

Q: ... You have already indicated that your recollection is that the Ektaprint does achieve transfer by use of a corona. When you made your study did you determine that the Baltazzi patent could be infringed by a machine that uses a corona transfer?

A: Certainly.

Q: And what is the basis for your opinion?

A: Well, ... the electrostatic attraction between the copy paper and the belt creates a transfer pressure in this range. That is the basis.

Q: In the range of 2 to 100 pounds?

A: Yes.

Q: How did you or why did you assert that under the corotron that the attraction was within that range?

A: I talked about this with Mr. Fort-camp and he is much more expert on this than I am and he assured me that that was why.

(Call deposition, at 302–03).

With regard to Kodak's claim that the Baltazzi patent is invalid, AMI notes that Baltazzi patent 3,598,580 was not discussed in the Root memorandum; rather, a different Baltazzi patent, No. 3,646,866, was the subject of Root's study.

### C. *The Shelffo Patent.*

The Shelffo patent was issued on September 20, 1971, and is entitled "Photo-lectrostatic Duplicator." The patent describes two types of copiers, both of which use a continuous photoconductor belt that bears one or more markers which, when they pass by sensors, trigger various machine operations in sychronization with the movement of the belt.

Kodak's allegations with regard to the Shelffo patent are fairly similar in nature to those outlined above. It contends that Russell Root made a detailed study of the Shelffo patent and advised AMI that a number of Shelffo's claims, now in issue in this action, were not infringed by Kodak's machines. Relying on the Root memorandum dated February 22, 1978, Kodak also charges that Root advised AMI that other Shelffo claims were invalid because of an IBM technical publication and a prior art patent (Garwin, No. 3,511,564), neither of which had been cited by the United States Examiner. Kodak argues that both the IBM publication and the Garwin patent were called to AMI's attention as invalidating prior art several years before the filing of this suit, but that AMI nevertheless failed to cite this prior art to the Patent Office and, instead, filed this allegedly groundless suit against Kodak for infringement.

AMI again rests on several grounds in opposing Kodak's allegations. First, it refers to Call's memorandum, where the author stated that the Shelffo patent was valid over all known prior art. Second, AMI relies on Karambelas' deposition testi-mony to the effect that he thoroughly reviewed the Shelffo patent and determined that it was valid and infringed. (Karambelas deposition, at 52–53). Third, AMI relies on Goldstein's deposition testimony that he found nothing to adversely affect the validity of the patents at issue in this action.

### D. *The Tregay Patent.*

The Tregay patent was issued on November 4, 1969, and is entitled "Photoelectrostatic Copying Machine." The patent is directed to an adjustable sheet guide feature and a document gating structure. No factual disputes have been called to the court's attention regarding the specific features of the Tregay patent.

### III. *AMI's Alleged Motives in Bringing this Action.*

According to Kodak, AMI's motives for filing this suit stem from its purported inability to commercialize an Electronic Document Communication System ("EDCS") and its resulting need for confidential technical information and equipment from Kodak to overcome this inability. Kodak asserts that AMI filed this suit with the hope of exacting such information and equipment as the price of settlement. In support of these claims, Kodak relies on a February 7, 1979, memorandum written by Joseph A. Verderber ("Verderber"), manager of AMI's EDCS project, in which Verderber sets forth the following statement as one of three possible approaches in dealing with Kodak:

> If our relations with Kodak become such that we do not see a reasonable chance of reaching an agreement regarding Ektaprint marketing rights, then we should reactivate our inference of patent infringement by Kodak. The price of settlement would be granting us the rights to the information we seek, plus the opportunity to purchase portions of the EK 100F at a predetermined markup over cost.

Kodak also relies on the following interchange at Verderber's deposition:

Q: And didn't AM[I] eventually sue Kodak?

A: I am told that they have, yes.

Q: And isn't that a reactivation of an inference of patent infringement?

A: Yes, it is.

(Verderber deposition, at 126.) Finally, Kodak refers to the handwritten notes of another AMI official, R.E. LaFever, who stated:

> In my opinion, I see little direct conflict between EK's products and the claims of these patents. Some of these concepts are very nearly the same, as noted, however, there are subtle differences which would make it difficult to obtain patent infringement relief.
>
> It is not contradictory to feel at the same time that these same patents may be useful for horse trading.

AMI rejects Kodak's assertion that this action was filed as a means of obtaining Kodak's cooperation in the development of the EDCS, contending that its true motive was to "halt the ongoing infringement of its patents and recover monetary damages, not less than a reasonable royalty, for past infringement." AMI Memorandum at 12 n. 7. AMI relies, in part, on the following deposition testimony of Verderber:

Q: So that you did intend to use the inference of patent infringement as a possible way to persuade Kodak to cooperate with you?

A: No, not intend. I had suggested that an approach to negotiations with Kodak would be to take that posture. I regarded this as a statement of alternatives rather than a recommendation.

(Verderber deposition, at 103.) AMI contends that rather than utilizing this suit and an inference of patent infringement as a means of obtaining information and equipment from Kodak, it instead chose to buy the entire Kodak Ektaprint machines at retail and disassemble them, thereby obtaining the necessary parts. AMI again relies on Verderber's deposition testimony:

Q: ... [D]oesn't the termination of Approaches One and Three leave only Approach Number Two [quoted above] as stated in your February 7, 1979 memo? ...

A: ... One of the obvious alternatives, of course, that existed was, in fact, the one that we chose. Namely, to buy Eastman Kodak Ektaprint machines at retail and embody them in commercial product....

Q: That wasn't one of the approaches you had suggested in the February 7 memo, was it?

A: That is correct. But because those approaches were how we get pieces of the Kodak machine without paying as much for them or how could we make them available? And what we do was step outside the set of constraints and say do we want them even if we have to pay retail? And we decided that for the first product generation we did. We want the Kodak machine even at retail.

(*Id.* at 125–26.) Finally, AMI points to the section of Verderber's deposition testimony immediately preceding the above-quoted statements relied on by Kodak:

Q: And with Approaches One and Three gone didn't you, in fact, follow Approach Two?

A: No.

Q: Didn't you reactivate your inference of patent infringement?

A: I did not. Whether the corporation did or did not, who did what as far as this relationship is concerned, I don't honestly know. As far as my attempts to get the corporation to do anything in support of my work on the EDCS, we went off buying machines at retail. While we tried to qualify alternative sources....

(*Id.* at 126).

Alternatively, AMI argues that even if its motives in filing this action were to convince Kodak to supply it with parts, such motives are not improper. It asserts

that it had "a legal right to shut down manufacture, use and sale of the Kodak ... machines, and to require their redesign so as to avoid infringement," and that "[t]here is no legal authority holding that AM[I] cannot forego its statutory rights in exchange for lawful business objectives." AMI memorandum, at 12.

## IV. The Applicable Law.

■ The principle that a defendant in a patent infringement action may interpose as a complete defense the patent applicant's failure to deal candidly with the Patent Office is a corollary of the equitable doctrine of unclean hands. *Precision Instrument Manufacturing Co. v. Automotive Maintenance Machinery Co.,* 324 U.S. 806, 814, 65 S.Ct. 993, 997, 89 L.Ed. 1381 (1945). The Supreme Court has held that the applicant has an "uncompromising duty" to disclose all facts material to the prosecution of the patent application because of the strong public interest in guaranteeing that patent monopolies spring from backgrounds free from fraud or other inequitable conduct and that such monopolies are kept within their legitimate scope. Public interest mandates that all such facts "be submitted formally or informally to the Patent Office, which can then pass upon the sufficiency of the evidence." *Precision Instrument,* 324 U.S. at 818, 65 S.Ct. at 999.[4]

■ It is thus well-settled that a patent obtained by fraud or unclean hands is invalid or unenforceable.[5] *See, e.g., Precision Instrument, supra; Scott Paper Co. v. Fort Howard Paper Co.,* 432 F.2d 1198 (7th Cir.1970), *cert. denied,* 401 U.S. 913, 91 S.Ct. 882, 27 L.Ed.2d 812 (1971). Proof of such fraud or unclean hands requires " 'clear, unequivocal and convincing' evidence." *Fort Howard Paper,* 432 F.2d at 1204 (quoting *United States v. American Bell Telephone Co.,* 167 U.S. 224, 251, 17 S.Ct. 809, 814, 42 L.Ed. 144 (1897). *See also Orthopedic Equipment Co., Inc. v. All Orthopedic Appliances, Inc.,* 707 F.2d 1376, 1383 (Fed.Cir.1983). *Pfizer, Inc. v. International Rectifier Corp.,* 538 F.2d 180, 186–87 (8th Cir.1976), *cert. denied,* 429 U.S. 1040, 97 S.Ct. 738, 50 L.Ed.2d 751 (1977). Furthermore, a claim of fraud or other egregious conduct in soliciting a patent can be asserted only if there has been a deliberate or intentional misrepresentation to the Patent Office. *Orthopedic Equipment,* 707 F.2d at 1383. *Fort Howard Paper,* 432 F.2d at 1204; *National Business Systems, Inc. v. AM International, Inc.,* 546 F.Supp. 340, 354 (N.D.Ill.1982). To prove fraud on the Patent Office, one must establish that the applicant knowingly and willfully concealed information from that office, that the information was not known to the Patent Examiner and that the information concealed was material. *Pfizer,* 538 F.2d at 186–87; *National Business Systems,* 546 F.Supp. at 355; *Columbia Broadcasting System, Inc. v. Zenith Radio Corp.,* 391 F.Supp. 780, 791 (N.D.Ill. 1975), *aff'd,* 537 F.2d 896 (7th Cir.1976).[6]

4. This duty of candor has been codified in 37 C.F.R. § 1.56:

"(a) A duty of candor and good faith toward the Patent and Trademark Office rests on the inventor, on each attorney or agent who prepares or prosecutes the application and on every other individual who is substantively involved in the preparation or prosecution of the application and who is associated with the inventor, with the assignee or with anyone to whom there is an obligation to assign the application. All such individuals have a duty to disclose to the Office information they are aware of which is material to the examination of the application."

5. The cases have sometimes distinguished between *fraud,* which invalidates the patent and

*inequitable conduct,* which is said to render the patent unenforceable rather than invalid. In an infringement action involving alleged misconduct in patent procurement, however, this distinction carries little, if any, practical significance, since under either theory the patent monopoly is terminated if the misconduct is ultimately proved. *See Pfizer, Inc. v. International Rectifier Corp.,* 538 F.2d 180 at 185 n. 11 (8th Cir.1976); *Timely Products Corp. v. Arron,* 523 F.2d 288, 297–98 (2d Cir.1975).

6. Information is material if "there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent." 37 C.F.R. § 1.56(a). Thus, applicants are not required to disclose everything which "may be

The Court of Appeals for the Federal Circuit recently set forth its first pronouncement on the issue of fraud. In *Orthopedic Equipment, supra,* defendant claimed that plaintiff's knee immobilizer patent had been fraudulently procured, asserting that plaintiff had failed to disclose to the Patent Office certain relevant prior art discovered and relied on in defending against a charge of infringement in a previous action involving another patent. The district court found that while plaintiff had in fact failed to disclose prior art, intent to defraud was not adequately established. Affirming this conclusion, Judge Nichols stated:

> "Establishing that a patent was procured by fraud ... requires clear, unequivocal, and convincing evidence of an intentional misrepresentation or withholding of a material fact from the PTO [Patent Office] .... Although inequitable conduct requires less stringent proofs as to both materiality and intent than common law fraud, mere evidence of simple negligence, oversight, or an erroneous judgment made in good faith not to disclose prior art is not sufficient to render a patent unenforceable."

*Orthopedic Equipment,* 707 F.2d at 1383 (citations omitted).

■ Of course, where, as here, the fraud or unclean hands defense is raised in a motion for summary judgment, the motion may be granted only if it is clear that no genuine issue of material fact exists. *See* Fed.R.Civ.P. 56(c). Moreover, while summary judgment has been granted in patent proceedings, *see, e.g., Medical Laboratory Automation, Inc. v. Labcon, Inc.,* 670 F.2d 671 (7th Cir.1981); *Shemitz v. Deere & Co., Inc.,* 623 F.2d 1180 (7th Cir. 1980), "the courts should exercise great caution before granting such a motion in an infringement action." *Landau v. J.D. Barter Construction Co., Inc.,* 657 F.2d 158, 161 (7th Cir.1981). *See also Pfizer,* 538 F.2d at 185.

relevant to an issue of patentability." *Pfizer,*

## V. *Discussion.*

The thrust of Kodak's motion is that AMI deliberately withheld from the Patent Office information about relevant prior art (the Fuji publication) which at the time was known to invalidate the Sargis patent but which had not been cited by the Examiner. Kodak also contends that AMI knew, before the instant suit was filed, that the Baltazzi and Shelffo patents were invalid and/or not infringed. It argues that this suit was filed with the hope of exacting information and equipment, not otherwise obtainable, from Kodak for AMI's EDCS project. Kodak concludes that AMI's misconduct renders all four of the patents unenforceable.

■ Applying the principles enunciated in the preceding section to the rather extensive record developed thus far, the court concludes that Kodak is not entitled to judgment as a matter of law. With regard to the Sargis patent, Kodak has failed to demonstrate, by "clear, unequivocal and convincing evidence," the degree of subjective culpability necessary for a finding of fraud. The deposition testimony of Goldstein, Karambelas and Call certainly raise a question as to whether the failure to cite the Fuji publication amounted to a willful and deliberate misrepresentation. There is arguable evidence in the record that AMI, in good faith, did not in fact believe that the Sargis patent was invalidated by the Fuji publication. Since AMI's conduct before the Patent Office, as well as its motivation in bringing the instant suit, raise disputed issues of intent, good faith and credibility, the court finds that summary judgment is not appropriate.

■ A similar conclusion is mandated with regard to the Baltazzi and Shelffo patents. As to the Baltazzi patent, various statements of Goldstein, Karambelas and Call suggest that AMI prosecuted the patent in good faith and did not believe, at the time this suit was filed, that the patent was invalid. Both Call and Karambelas, for example, have stated that they reviewed

538 F.2d at 185–86.

the patent and believed that it should be asserted against the Ektaprint machines. Similar deposition testimony refutes Kodak's claim that AMI was aware of both the IBM publication and the Garwin patent and knew that they invalidated the Shelffo patent. The court has been presented with sharply different versions of facts surrounding the issuance of these patents and their inclusion in this suit. These disputes present genuine issues of fact as to the states of mind of AMI's scientists and patent counsel, and preclude entry of summary judgment.

■ The record also fails to establish, as a matter of law, that AMI's motives in bringing this action were improper. It does appear that at least at some point, AMI, through Verderber, considered raising an "inference" of patent infringement as a means of obtaining Kodak's cooperation in developing the EDCS project; in the words of one AMI official, the patents were considered to be useful "for horse trading." An inference of patent infringement, however, was only one of three possible approaches suggested by Verderber in his February 7, 1979, memorandum. Importantly, there is testimony that none of the three approaches was ultimately adopted, as AMI decided to buy the Ektaprint machines at retail and disassemble them. Despite Kodak's strenuous arguments to the contrary, the court is simply unable to conclude at this juncture that the filing of this instant suit was the result of some improper motive.

Thus, in light of the numerous disputed issues of fact, the portion of Kodak's motion based on the claim that the Sargis, Baltazzi, Shelffo and Tregay patents are unenforceable because of the unclean hands doctrine must be denied.[7]

## VI. Kodak's Request that AMI's Complaint be Dismissed Pursuant to Fed.R.Civ.P. 37(b)(2)(C).

On October 15, 1980, Kodak served interrogatories to AMI and a request for production of documents. AMI filed answers to the interrogatories on November 17, 1980, objecting to several of them on the basis of the qualified work product privilege. Kodak subsequently filed a motion to compel pursuant to Fed.R.Civ.P. 37. On October 21, 1981, this court granted Kodak's motion, ordering plaintiff to identify all documents which it intended to withhold under a claim of privilege and to produce all documents that did not meet the requirements of such a claim. AM International, Inc. v. Eastman Kodak Co., 100 F.R.D. 255 (N.D.Ill.1981) ("Kodak I"). Dissatisfied with AMI's identification and production, Kodak, on April 26, 1982, filed a second motion to compel. That motion sought production of all material then being withheld by AMI under a claim of the work product privilege which referred or related to the Fuji publication as well as any of the four patents involved in this suit, including pre-suit product tests. On October 25, 1982, this court granted the second motion to compel, ordering AMI to produce for inspection all documents identified in an 18-page appendix which referred to the four patents as well as the Fuji publication. AM International, Inc. v. Eastman Kodak Co., No. 80 C 4016 (N.D.Ill. Oct. 25, 1982) ("Kodak II"). In reaching that conclusion, the court emphasized that "AMI's knowledge and motivation when it issued the patents sued upon, when it sought to determine whether they were valid and infringed and when it sued Kodak are all of critical importance to the resolution of this case." Kodak II, slip op. at 6.

Kodak now charges that AMI has intentionally and repeatedly refused to comply with the orders of this court as set forth in Kodak I and Kodak II. It claims that documents which should have been included in the 18-page appendix were omitted; that the description of the documents that were included is inadequate; and that de-

---

7. With this conclusion, the court need not address Kodak's argument that fraud in connection with one patent invalidates all other patents

sought to be enforced by the alleged perpetrator of the fraud.

spite repeated assurances that all documents have been fully identified, AMI continues to withhold many documents under a claim of the work product privilege. Based on the purported "cavalier manner in which ... [AMI] has ·repeatedly flaunted the Court's orders[,]" Defendant's Brief in Support of its Motion for Summary Judgment, at 21, Kodak now requests that the complaint be dismissed pursuant to Rule 37.

■ The Federal Rules of Civil Procedure allow a court to enter an order dismissing the action as a sanction where a party fails to obey an order to provide or permit discovery. *See* Fed.R.Civ.P. 37(b)(2)(C). While a district court has broad powers under Rule 37, dismissal of a plaintiff's case with prejudice is "a sanction of last resort, applicable only in extreme circumstances, ..." *EEOC v. First National Bank of Jackson*, 614 F.2d 1004, 1007 (5th Cir.1980) (citation omitted), *cert. denied*, 450 U.S. 917, 101 S.Ct. 1361, 67 L.Ed.2d 342 (1981). Dismissal is generally proper only if the plaintiff has acted willfully or intentionally in disobeying court orders. *See National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 643, 96 S.Ct. 2778, 2781, 49 L.Ed.2d 747 (1976) ("extreme sanction" of dismissal affirmed because of respondents' "flagrant bad faith" and their counsel's "callous disregard" of their responsibilities); *Societe Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers*, 357 U.S. 197, 212, 78 S.Ct. 1087, 1095, 2 L.Ed.2d 1255 (1958) (dismissal reversed in part because of absence of bad faith); *Charter House Insurance Brokers, Ltd. v. New Hampshire Insurance Co.*, 667 F.2d 600, 605 (7th Cir.1981) ("A Rule 37 dismissal requires a showing of 'willfullness, bad faith, or fault' by the dismissed party, ..."); *In re Oil Spill by Amoco Cadiz off the Coast of France on March 16, 1978*, 93 F.R.D. 840, 842 (N.D.Ill.1982) ("Where a party has intentionally or willfully refused to comply with a court's order directing discovery, the court is free to employ the sanction[ ] of dismissal ....").

■ Evaluated under these standards, Kodak's arguments in favor of dismissal are not persuasive. First, it appears that many of the documents which Kodak claims AMI is improperly withholding have been generated since the filing of this suit on July 30, 1980. The court's ruling in *Kodak II*, however, was not directed at the ongoing, active litigation files of AMI and its counsel. As previously noted, the court, in ordering production, was principally concerned with the knowledge and motivation of AMI and its counsel *up until* the point that this action was filed. The focus, then, was on pre-litigation documents, and Kodak's request for ongoing litigation material is based on a misreading of the court's order.

Second, contrary to Kodak's characterization of the description of documents in the appendix as inadequate, the court finds that the description is more than sufficient. The appendix specifically identifies the patents that are discussed in each relevant document, and provides descriptions such as "Opinion concerning basis for instituting litigation against Eastman Kodak [ (page 1) ]"; "Kodak infringement review [page 2]"; "summary of notes of conference with Goldstein regarding Kodak infringement [page 6]"; and "Re: letter regarding infringement · of AM patents [page 8]". These descriptions are certainly sufficient to inform Kodak of the general content of the documents.

As the court indicated in its June 22, 1983, order, the most serious charges of discovery abuse raised by Kodak are found at pages 17–20 of its memorandum in support of its motion for summary judgment. For example, Kodak contends that AMI is withholding studies, infringement and validity opinions and recommendations allegedly submitted by the Elwood Kendrick law firm, AMI's former outside patent counsel. AMI now asserts, however, that any opinions from that firm were oral rather than written. Having been offered no concrete evidence to the contrary and relying, of course, on the veracity of AMI's representation, the court must conclude that no such written studies or opinions are

currently being withheld by AMI. Plaintiff also rejects Kodak's inference that it retained a second outside patent counsel to replace the Kendrick firm because the latter advised AMI not to bring the instant action, arguing that the Kendrick firm favored the filing of a complaint against Kodak and that a second firm was retained simply because it was one with whom Karambelas had previously done business. This interpretation is supported by both the Karambelas Memorandum and the Schedule of Anticipated Litigation, attached as exhibits to AMI's memorandum. A second charge raised by Kodak concerns the draft of an infringement notice, which was purportedly rewritten to omit any reference to the Sargis patent before being forwarded to Kodak. Despite the supplemental briefs recently filed by the parties, the record on this point remains unclear. While Goldstein testified that there was never any recommendation from any outside patent counsel not to include the Sargis patent in the notice to Kodak, he failed to explain precisely why it was not in fact included in the final letter. This issue, therefore, is simply left to the speculation of the parties. Finally, there exists the charge that AMI failed, in a variety of reports, to make any reference to the Fuji publication, despite the fact that it had allegedly received opinions and studies pointing out the defects in the patents ultimately sued upon. These opinions and studies, contends Kodak, are now being withheld. As discussed in Parts II(A) and V, *supra*, however, AMI arguably did not consider the Fuji publication to be an invalidating prior art. The deposition testimony of both Goldstein and Karambelas indicates that they were not aware of any studies suggesting that the Sargis patent was invalid. With this testimony, given under oath, the court must presume that such studies do not exist.

The record as developed thus far simply does not indicate that AMI's actions constitute the type of willful misconduct justifying the "use of the Draconian remedy of dismissal, ..." *Marshall v. Segona*, 621 F.2d 763, 767 (5th Cir.1980) (citation omitted). As this court noted in *Kodak II*, slip op. at 9–10, the initial decision to order production of the documents at issue was a close one, arrived at only after a delicate balancing of the public policies underlying the work product privilege and the material sought to be discovered. Under such circumstances, AMI was acting within its rights in resisting Kodak's motions to compel.

## VII. *Conclusion.*

For the reasons stated above, Kodak's motion for summary judgment is denied.